UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
JANINE SESA,

                                    Plaintiff,

                                                                          13-CV-2670 (RPP)

                    -against-

                                                                          **OPINION & ORDER**


CAROLYN COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

                                    Defendant.
------------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

        Janine Sesa (the "Plaintiff" or "Sesa") brings this action pursuant to Section 205(g) of the

Social Security Act, as amended , 42 U.S.C. § 405(g), to review a final decision of the

Commissioner of Social Security (the "Commissioner" or the "Defendant") denying Sesa's

application for disability insurance benefits.  On October 10, 2013, the Plaintiff filed a motion

with this Court for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of

Civil Procedure.  (Pl.'s Mem. in Supp. of Mot. for J. on the Pleadings Under Rule 12(c) Fed. R.

Civ. P. ("Pl.'s Mot."), ECF No. 12.)  On March 18, 2014, the Defendant opposed the Plaintiff's

motion and made a cross-motion for judgment on the pleadings.  (Mem. of Law in Supp. of the

Comm'r's Cross-Mot. for J. on the Pleadings and in Opp'n to Pl.'s Mot. for J. on the Pleadings

("Def.'s Opp'n"), ECF No. 21.)  The Plaintiff replied on March 25, 2014.  (Pl.'s Reply Mem. in

Supp. of Mot. for J. on the Pleadings Under Rule 12(c) Fed. R. Civ. P. ("Pl.'s Reply"), ECF No.

24.)

For the reasons discussed herein, the Plaintiff's motion for judgment on the pleadings is DENIED and the Defendant's cross-motion for judgment on the pleadings is GRANTED.

## I.   BACKGROUND

### A.  Procedural History

On August 4, 2010, Sesa filed an application for disability benefits under 42 U.S.C. § 401 et seq.  (Administrative and Supplemental Rec. Filed by the Comm'r ("R.") 112-13, 134; ECF No. 8.)  Sesa alleged disability based on polyneuropathy, peripheral neuropathy, sleep apnea, status post-ovarian cancer, fatigue, chronic pain, and obesity.  (R. at 125.)  She alleged that she became disabled on May 6, 2010.  (R. at 112.)  The application was denied initially on October 26, 2010.  (R. at 58.)

Sesa requested a hearing before an Administrative Law Judge ("ALJ").  (R. at 70-71.)  A hearing was held on August 4, 2011, before ALJ Robert Gonzalez, at which Sesa appeared with counsel.  (R. at 35-57.)  ALJ Gonzalez considered the case de novo and, on September 12, 2011, issued a written decision finding that Sesa was not under a disability.  (R. at 21-31.)  Sesa requested review of the ALJ's decision.  (R. at 17-20.)  The decision of the ALJ became the final decision of the Commissioner on February 2, 2013, when the Appeals Council denied Sesa's request for review.  (R. at 1-6.)  On April 23, 2013, an action was commenced in this Court for review of the Commissioner's decision.  (Compl., ECF No. 1.)

The issue before this Court is whether the Commissioner's decision finding that Sesa was not disabled is supported by substantial evidence.

### B.  Non-Medical Evidence Before the Administrative Law Judge

Janine Sesa was born on November 1, 1964, and is currently forty-nine years of age.  (R. at 164.)  She lives in Slate Hill, New York, with her partner, Joanne.  (R. at 40.)  She graduated

from a four-year college with a Bachelors of Arts in computer science in 1997.  (R. at 126.)  Sesa worked as a software engineer for IBM from January 1997 to May 2010.  (R. at 148.)  She has not worked since May 6, 2010.  (R. at 164.)  At the time of the ALJ's determination, Sesa received long-term disability insurance payments from IBM.  (R. at 39.)

Sesa was diagnosed with ovarian cancer in 2004.  (R. at 40.)  At the time of the hearing, Sesa's cancer was in remission.  (R. at 40-41.)  At the hearing before the ALJ, she stated that she was unable to work as a result of the side effects from the radiation and chemotherapy that she underwent in 2004 to treat her ovarian cancer.  (R. at 41, 55.)  Specifically, she complained of tingling, pain, and numbness in her hands and feet due to neuropathy.[1]  (R. at 41.)  Sesa stated that she was taking Cymbalta, which helped with the neuropathy.  (R. at 43.)  She also complained of back pain due to a disc problem.  (R. at 41.)  She used a transcutaneous electrical nerve stimulation ("TENS")[2] unit for her back pain.  (R. at 50.)  She stated that she still had symptoms of pain despite the medications she was taking.  (R. at 50.)  Sesa also complained of sleep apnea and said that a continuous positive airway pressure ("CPAP") machine[3] helped her sleep.  (R. at 49.)

---

[1] Peripheral neuropathy, or polyneuropathy, is a functional disturbance or pathological change in the peripheral nervous system that occurs in several peripheral nerves simultaneously.  Dorland's Illustrated Medical Dictionary ("Dorland's") 1268 (32nd Ed. 2012).  Some people may experience temporary numbness, tingling, and pricking sensations, sensitivity to touch, or muscle weakness.  Others may suffer more extreme symptoms, including burning pain, muscle wasting, paralysis, or organ or gland dysfunction.  Peripheral Neuropathy Fact Sheet, Nat'l Inst. of Neurological Disorders and Stroke (Apr. 16, 2014), http://www.ninds.nih.gov/disorders/peripheralneuropathy/detail_peripheralneuropathy.htm.

[2] A TENS unit or TENS machine is a machine that applies electrical currents through electrodes placed on the skin for pain control. It can be applied with varying frequencies, from low (< 10 Hz) to high (> 50 Hz).  Josimari M. DeSantana et al., Effectiveness of Transcutaneous Electrical Nerve Stimulation for Treatment of Hyperalgesia and Pain, U.S. Nat'l Library of Medicine Nat'l Inst. of Health (Sep. 18, 2009), http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2746624/.

[3] CPAP, or continuous positive airway pressure, is a treatment that uses mild air pressure to keep the airways open.  Dorland's, supra, at 426.  CPAP treatment involves a CPAP machine, which has three main parts: (1) a mask or other device that fits over the nose or nose and mouth with straps keep the mask in place; (2) a tube that connects the

Sesa also testified about the activities in which she engaged.  (R. at 46-49.)  She testified that she was able to drive for about thirty minutes, (R. at 45), and did laundry and dishes.  (R. at 46.)  She did not go shopping.  (R. at 46.)  She could cook simple meals, but had to be careful when cutting vegetables because her hands would often go numb.  (R. at 51.)  When cooking, she stated that she forgot ingredients because she was having trouble with her memory.  (R. at 52.)  She napped one to two times a day for one to two hours at a time.  (R. at 52.)

At the hearing before the ALJ, Sesa described two long car rides that she had been on since May 2010.  (R. at 46.)  In April 2011, she traveled from her home in New York to West Virginia by car as a passenger.  (R. at 46.)  In June 2011, she traveled from her home in New York to the Finger Lakes area in New York by car as a passenger.  (R. at 47.)  She testified that the car ride to the Finger Lakes region took about three hours.  (R. at 47.)

**C.  Medical Evidence Before the Administrative Law Judge**

### i.  Before May 6, 2010

On January 22, 2009, Dr. Dmitri Gorelov of Crystal Run Healthcare ("Dr. Gorelov") treated Sesa for bilateral numbness and tingling in her hands and feet.  (R. at 253.)  Nerve conduction studies and electromyography ("EMG") revealed bilateral median neuropathies of Sesa's wrists (carpal tunnel syndrome).  (R. at 254.)

In treatment notes on January 26, 2009, Dr. Robert Dinsmore of Crystal Run Healthcare ("Dr. Dinsmore") reported that Sesa had a history of ovarian cancer, specifically, a mixed mullerian tumor that was diagnosed in April 2004.  (R. at 235.)  In 2004, she underwent a total

---

mask to the machine's motor; and (3) a motor that blows air into the tube.  What is CPAP?, Nat'l Heart, Lung, and Blood Inst. (Dec. 13, 2011), http://www.nhlbi.nih.gov/health/health-topics/topics/cpap/.

abdominal hysterectomy and bilateral salpingo-oophorectomy[4] and treatment with adjuvant therapy and radiation therapy.  (R. at 235.)  At the time of treatment on January 26, 2009, Dr. Dinsmore noted that Sesa felt well without abdominal pain, nausea, vomiting, anorexia, or weight loss.  (R. at 235.)  Her tumor marker was negative.  (R. at 235.)  There was also no evidence of recurrence of ovarian cancer on February 6, 2009, (R. at 246), August 11, 2009, (R. at 223), or March 4, 2010.  (R. at 180, 215.)

On January 27, 2009, Dr. Zoltan Fekete of Crystal Run Healthcare ("Dr. Fekete") ordered magnetic resonance imaging ("MRI") of Sesa's cervical spine.  (R. at 248.)  The MRI revealed C5-C6 spondylosis[5] and left paracentral disc herniation with resultant cervical cord narrowing and impingement.  (R. at 248.)

On February 21, 2009, Dr. Fekete evaluated Sesa for complaints of neck pain, neuropathy, and carpal tunnel syndrome.  (R. at 230-32.)  The neurological examination revealed intact cranial nerves, normal reflexes, no sensory loss, no motor weakness, normal fine motor skills, and intact balance, gait, memory, and coordination.  (R. at 232.)  Dr. Fekete diagnosed peripheral neuropathy, carpal tunnel syndrome, and cervical stenosis.[6]  (R. at 232.)

On April 1, 2009, Dr. Steven Grundfast of Crystal Run Healthcare ("Dr. Grundfast") evaluated Sesa's sleep apnea.  (R. at 228-29.)  On examination, Dr. Grundfast found that Sesa's lungs were clear and her heart sounds were normal.  (R. at 228.)  He recommended that Sesa continue to use her CPAP machine nightly and found that her sleep apnea was well-controlled. (R. at 228.)

---

[4] Surgical removal of a uterine tube and its corresponding ovary.  Dorland's, supra, at 1665.

[5] Abnormal thickening and immobility of a vertebral joint.  Ida G. Dox et al., Attorney's Illustrated Medical Dictionary S58 (1997).

[6] Stenosis is an abnormal narrowing of a duct or canal.  Dorland's, supra, at 1769.

On February 9, 2010, Dr. Dinsmore evaluated Sesa for complaints of numbness, tingling, and a burning sensation in her feet.  (R. at 182.)  Dr. Dinsmore diagnosed neuropathy, and indicated that it was secondary to chemotherapy.  (R. at 182.)  Sesa complained of pain that she stated was causing her to have difficulty concentrating at work and had been affecting her work performance.  (R. at 182.)

On March 1, 2010, Dr. Bindu Pathrose of Crystal Run Healthcare ("Dr. Pathrose") treated Sesa for complaints of peripheral neuropathy.  (R. at 217-19.)  Sesa complained of a numb, tingling sensation in her extremities, and indicated that she sometimes had trouble walking because she "wasn't sure when her feet were going to hit the ground."  (R. at 217.)  Sesa also indicated that she had trouble holding objects and sometimes dropped them.  (R. at 217.)  Upon evaluation of Sesa, Dr. Pathrose found that Sesa's sensation in her upper and lower extremities was grossly intact to light touch.  (R. at 219.)  Sesa could sit and stand independently with good standing balance.  (R. at 219.)  Her gait was normal and she was alert and oriented.  (R. at 219.)  Dr. Pathrose also noted that Sesa did not exhibit any unusual anxiety or evidence of depression.  (R. at 219.)

On April 30, 2010, Dr. Grundfast evaluated Sesa for sleep apnea.  (R. at 206.)  Sesa complained of having issues with short-term memory, of feeling fatigued, and of having pains in her lower extremities that interfered with her sleep.  (R. at 206.)  Dr. Grundfast found that Sesa had suboptimal control of her sleep apnea and recommended that she increase the pressure of her CPAP machine.  (R. at 207.)  Dr. Grundfast also diagnosed Sesa with uncontrolled morbid obesity.  (R. at 207.)

### ii.  After May 6, 2010

On May 7, 2010, Dr. Dinsmore saw Sesa for an office visit.  (R. at 205.)  Sesa

complained of memory loss and difficulty concentrating, and stated that it was affecting her

work.  (R. at 205.)  Dr. Dinsmore attributed Sesa's intellectual decline in part to the

chemotherapy used to treat her ovarian cancer in 2004, and in part to the medication she took for

neuropathic pain, including Nerontin, Lyrica, and Vicodin.  (R. at 205.)

On May 11, 2010, Dr. Gorelov evaluated Sesa's complaint of poor memory.  (R. at 202-

04.)  Upon an examination of Sesa's motor skills, Dr. Gorelov found that she showed 5/5

strength in all muscle groups, equal deep tendon reflexes, intact sensation, normal coordination,

and steady gait.  (R. at 203.)  The mental status examination showed that she was fully oriented

and her comprehension, attention, and concentration were normal.  (R. at 203.)  Her immediate

and recent recall were 3/3 and she was able to follow complex three-step commands.  (R. at 203.)

Dr. Gorelov similarly reported essentially normal mental status and neurological findings at

appointments with Sesa on June 1 and June 29, 2010.  (R. at 193-98.)  In his treatment notes for

each appointment, Dr. Gorelov found that her memory loss was likely an effect of poor

concentration due to Sesa's sleep apnea, the sedating effect of her pain medication, and

depression.  (R. at 195, 197, 203.)

On May 26, 2010, Dr. Thomas Booker of Crystal Run Healthcare ("Dr. Booker")

evaluated Sesa for complaints of leg pain.  (R. at 199-201.)  Dr. Booker found that she was able

to walk independently and Sesa stated that the pain had not interfered with her activities of daily

living.  (R. at 199.)  Dr. Booker diagnosed peripheral neuropathy and started Sesa on a TENS

unit for her pain.  (R. at 201.)

On July 16, 2010, Dr. Dinsmore examined Sesa and noted that Sesa had a history of neuropathy and sleep apnea, and noted that Sesa continued to complain of problems with concentration and memory loss.  (R. at 176.)  Dr. Dinsmore also sent a statement to Sesa's insurance company on July 16, 2010.  (R. at 376-80.)  In that statement, Dr. Dinsmore opined that Sesa had a moderate limitation of functional capacity and was capable of clerical or administrative sedentary activity.  (R. at 378.)  Dr. Dinsmore opined that Sesa was totally disabled from her occupation, but he could not determine whether she was totally disabled from any occupation.  (R. at 378.)

On September 17, 2010, Dr. Gorelov reported essentially normal mental status and neurological findings.  (R. at 296-98.)  Dr. Gorelov diagnosed subjective memory loss, peripheral neuropathy, and carpal tunnel syndrome/ulnar neuropathies.  (R. at 297-98.)

On September 22, 2010, Dr. Auerbach, a state agency medical consultant, noted that Sesa exhibited some neuropathic symptoms.  (R. at 258.)  Dr. Auerbach opined that Sesa was limited to lifting ten pounds occasionally, could stand or walk for two hours and sit for six hours in an eight-hour work day, but that she needed to avoid heights and hazards.  (R. at 258.)

On September 23, 2010, Dr. Dinsmore examined Sesa and reported essentially normal physical and neurological findings.  (R. at 371.)  Dr. Dinsmore diagnosed ovarian cancer, sleep apnea, vitamin D deficiency, and peripheral neuropathy.  (R. at 371.)

On September 29, 2010, Dr. Booker evaluated Sesa for complaints of leg pain.  (R. at 342-44.)  Dr. Booker noted that Sesa's pain had been alleviated by a prescription of Vicodin.  (R. at 342.)  Sesa had not yet gotten her TENS unit for her pain and neuropathy.  (R. at 344.)  Dr. Booker diagnosed Sesa with suboptimal control of her peripheral neuropathy.  (R. at 344.)

On October 4, 2010, Dr. Dinsmore evaluated Sesa for complaints of back pain.  (R. at 367.)  Dr. Dinsmore reported essentially normal physical findings and diagnosed ovarian cancer, osteopenia, and peripheral neuropathy.  (R. at 367-69.)

On October 6, 2010, nerve conduction studies and an EMG revealed bilateral median neuropathies of Sesa's wrists (carpal tunnel syndrome) and bilateral ulnar neuropathies at her elbows.  (R. at 365-66.)

On October 18, 2010, Leslie Helprin, Ph. D., conducted a consultative psychological evaluation of Sesa.  (R. at 268-73.)  Dr. Helprin found that Sesa was able to follow and understand simple directions and instructions, perform simple rote tasks and complex tasks independently, maintain attention and concentration, maintain a regular schedule, make appropriate decisions, relate adequately with others, and deal appropriately with stress.  (R. at 271.)  Dr. Helprin found that the results of her examination did not appear to be consistent with any psychiatric problems that would significantly interfere with Sesa's ability to function on a daily basis.  (R. at 271.)

On October 19, 2010, Dr. Gorelov evaluated Sesa for complaints of numbness in her hands and peripheral neuropathy.  (R. at 293-95.)  Dr. Gorelov diagnosed subjective memory loss, peripheral neuropathy, and carpal tunnel syndrome/ulnar neuropathies.  (R. at 295.)  Dr. Gorelov noted that Sesa did not want further intervention for her carpal tunnel syndrome/ulnar neuropathies.  (R. at 295.)

On October 25, 2010, H. Ferrin, a state agency psychological consultant, opined that Sesa had no medically determinable mental impairment.  (R. at 274.)  H. Ferrin assessed that Sesa had no restrictions on her activities of daily living; no difficulty in maintaining social functioning;

9

mild difficulty in maintaining concentration, persistence, and pace; and no episodes of deterioration.  (R. at 284.)

On November 4, 2010, x-rays of Sesa's lumbar spine showed mild degenerative changes. (R. at 364.)

On December 6, 2010, an MRI of Sesa's lumbar spine revealed multilevel spondylosis, and an L4-L5 disc bulge that resulted in mild central canal and mild bilateral neural foramina stenosis. (R. at 362-63.)

On December 13, 2010, Dr. Dinsmore evaluated Sesa for back pain, which Sesa reported was somewhat better with rest and pain medication.  (R. at 360.)  Dr. Dinsmore examined Sesa and reported essentially normal physical findings.  (R. at 361.)  He diagnosed her with low back pain and no evidence of ovarian cancer.  (R. at 360.)  Dr. Dinsmore made the same findings at a follow-up visit on March 24, 2011.  (R. at 352-53.)

On February 7, 2011, Dr. Booker evaluated Sesa for leg and arm pain.  (R. at 339-41.) Sesa reported that taking Norco had been taking the edge off her pain.  (R. at 339.)  Dr. Booker found that Sesa had suboptimal control of her peripheral neuropathy and recommended physical therapy for her back and methadone for pain.  (R. at 341.)

On April 6, 2011, Dr. Booker noted that Sesa's back and leg pain were reduced by the pain medication, and that she was not reporting any side effects.  (R. at 333.)

On May 2, 2011, Dr. Dinsmore treated Sesa at an unscheduled visit for a rash at the nape of her neck.  (R. at 350.)  He examined Sesa and reported that a review of her neurological and psychiatric systems showed no dizziness or emotional disturbances.  (R. at 351.)  A physical exam showed that she was in no apparent distress, her respiratory system was normal to inspection, she had normal musculature with no skeletal tenderness or joint deformity, and that

10

her extremities appeared normal.  (R. at 351.)  A neurological review showed that she was alert and oriented.  (R. at 351.)

On May 4, 2011, Dr. Booker evaluated Sesa for back and leg pain.  (R. at 331.)  Sesa reported that the medication she was taking was no longer helping.  (R. at 331.)  Dr. Booker prescribed one month of a different pain medication.  (R. at 332.)

In a statement to Sesa's insurance company dated July 22, 2011, Dr. Dinsmore assessed that Sesa could lift ten pounds, sit for five hours, stand for one hour, and walk for one hour intermittently.  (R. at 374.)  Dr. Dinsmore opined that Sesa could not climb, twist, bend, stoop, push, pull, reach above shoulder level, or perform fine finger or eye/hand movements.  (R. at 374.)  However, Dr. Dinsmore found that Sesa was able to function under stress and engage in interpersonal relations without limitations.  (R. at 374.)  Dr. Dinsmore concluded that Sesa could work zero hours per day.  (R. at 374.)

In a physical residual functional capacity questionnaire dated July 30, 2011, Dr. Dinsmore assessed that Sesa could sit for about two hours and stand or walk for less than two hours in an eight-hour work day.  (R. at 383.)  Sesa could lift up to ten pounds occasionally.  (R. at 384.)  Dr. Dinsmore assessed that Sesa's significant pain and fatigue caused poor endurance and inability to engage in sustained activities.  (R. at 385.)

**D.  ALJ Gonzalez's Decision**

In a decision dated September 12, 2011, ALJ Robert Gonzalez issued a written decision denying Sesa's application for disability insurance benefits, finding that Sesa was not under a disability within the meaning of the Social Security Act from May 6, 2010, to the date of ALJ Gonzalez's decision.  (R. at 24-31.)

ALJ Gonzalez conducted a five-step analysis, considering both Sesa's testimony and the medical record, (R. at 25-31), and determined that Sesa had the residual functional capacity to perform sedentary work except that she must avoid hazards, was limited to unskilled work, and was restricted to only frequently stooping, and frequently fingering and handling.  (R. at 27.) ALJ Gonzalez found that the medical evidence did not establish that Sesa's impairments prevented the performance of work-related activities.  (R. at 28.)  In making this determination, ALJ Gonzalez gave little weight to Dr. Dinsmore's opinion, gave significant weight to the opinion of Dr. Helprin, and gave some weight to the opinions of agency consultants Ferrin and Dr. Auerbach.  (R. at 29.)  ALJ Gonzalez also found that Sesa's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible.  (R. at 29.)

At step four, ALJ Gonzalez found that Sesa was unable to perform any past relevant work, because the demands of her past relevant work as a software engineer exceeded her residual functional capacity.  (R. at 30.)  At step five, ALJ Gonzalez found that, "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform."  (R. at 30.)  He concluded that Sesa was not "under a disability, as defined in the Social Security Act, from May 6, 2010, through the date of this decision," September 12, 2011.  (R. at 31.)

## II.    LEGAL STANDARD

### A.  Scope of Judicial Review

Judicial review of the Commissioner's decision denying disability benefits is strictly limited.  Baneky v. Apfel, 997 F. Supp. 543, 544 (S.D.N.Y.1998).  The role of the federal courts is to decide whether the Commissioner has applied the appropriate legal standards and whether the Commissioner's findings of fact are supported by substantial evidence.  42 U.S.C. §§ 405(g),

1383(c)(3) (2010); see also Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir.1998). If the Court finds that the Commissioner failed to apply the correct legal standards, such an error of law may be grounds for reversal. Pollard v. Halter, 377 F.3d 183, 189 (2d Cir. 2004) (internal citation omitted). For a factual determination, if the Court finds that there is substantial evidence for a finding of fact, the Commissioner's decision must be upheld, even where substantial evidence may support the plaintiff's position and despite that the Court's independent analysis of the evidence may differ from the Secretary's. Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (internal citations omitted). Substantial evidence in this context has been defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. of New York v. N.L.R.B., 305 U.S. 197, 229 (1938)).

## B.  Disability Determination

A person is considered disabled for Social Security benefits purposes when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (2004).

The determination whether a person is under a disability within the meaning of the Social Security Act belongs to the Commissioner. 20 C.F.R. § 404.1527(d)(1) (2012). The Commissioner has established a five-step sequential evaluation for adjudication of disability claims, set forth at 20 C.F.R. § 404.1520, which the Second Circuit has articulated as follows:

> First the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If [she] is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits [her]

13

physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider [her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [she] has the residual functional capacity to perform past work. Finally, if the claimant is unable to perform [her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

DeChirico v. Callahan, 134 F.3d 1177, 1179 (2d Cir.1998) (internal citation omitted).

A claimant bears the burden of proof as to the first four steps.  Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).  If a claimant is able to meet her burden of proof at the first four steps, the burden then shifts to the Commissioner to provide evidence to show that jobs exist in significant numbers in the national economy that the claimant can perform, given her residual functional capacity and vocational profile of age, education, and work experience.  Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002).  The Commissioner must consider the entire record, including any objective medical evidence, medical opinions based on such evidence, subjective evidence of pain or disability, and the plaintiff's educational background, age, and work experience.  See Parker v. Harris, 626 F.2d 225, 231 (2d Cir.1980) (internal citation omitted).

## III.    DISCUSSION

The Plaintiff contends that ALJ Gonzalez's determination that the Plaintiff was able to perform sedentary work was contrary to law and that the Court should either order the Commissioner to calculate benefits for Sesa or, in the alternative, vacate the Commissioner's decision and order a rehearing.  (Pl.'s Mot. at 23.)  The Defendant cross-moves this Court to

affirm the Commissioner's decision on the basis that ALJ Gonzalez's decision that Sesa is not disabled is supported by substantial evidence.  (Def.'s Opp'n at 11.)

### A. ALJ Gonzalez's Application of the Five-Step Sequence to Sesa's Claim

At step one, ALJ Gonzalez found that Sesa had not engaged in substantial gainful activity since May 6, 2010, her alleged onset date of disability.  (R. at 26.)  At step two, ALJ Gonzalez found that Sesa had the following severe impairments: obesity, status post ovarian cancer, sleep apnea, mild bilateral carpal tunnel syndrome, peripheral neuropathy, and lumbar degenerative disc disease.  (R. at 26.)  ALJ Gonzalez found that Sesa's alleged depression was not a severe impairment.[7]  (R. at 26.)  At the third step, ALJ Gonzalez determined that Sesa did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 27.)  The findings at step one through three are not disputed by the parties.  (See generally Pl.'s Mot.; Def.'s Opp'n.) Before proceeding to step four, the Court will address ALJ Gonzalez's residual functional capacity determination, which is disputed by the parties.

### i. ALJ Gonzalez's Residual Functional Capacity Determination

ALJ Gonzalez determined that Sesa had the residual functional capacity to perform sedentary work except that she must avoid hazards, is limited to unskilled work, and is restricted to only frequently stooping and frequently fingering and handling.  (R. at 27.)  In reaching this conclusion, the Plaintiff argues that ALJ Gonzalez erred by (1) failing to give controlling weight to the conclusions of Dr. Dinsmore, one of the Plaintiff's treating physicians; (2) discrediting the

---

[7] ALJ Gonzalez found that Sesa's depression did not cause more than minimal limitations in Sesa's ability to perform basic mental work activities and was, therefore, not severe.  (R. at 26.)  In making this determination, ALJ Gonzalez noted that the record did not document any psychiatric treatment, and that Sesa was not taking any medication specifically for depression.  (R. at 26-27.)

Plaintiff's allegations of pain; (3) failing to make a function-by-function evaluation of the Plaintiff's impairments; and (4) failing to make an evaluation of the combined effect of the Plaintiff's impairments.  (Pl.'s Mot. at 12-22.)  Each area of ALJ Gonzalez's analysis will be addressed in turn.

### 1.  Dr. Dinsmore's Opinion

The Plaintiff contends that ALJ Gonzalez failed to afford adequate weight to the opinion of Dr. Dinsmore, one of Sesa's treating physicians.  Even though the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, the opinion of the treating physician is not afforded controlling weight where "the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts."  Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir.2004) (citation omitted).

ALJ Gonzalez found that Dr. Dinsmore's opinion that Sesa was only able to lift and carry up to ten pounds occasionally, sit for about two hours, and stand or walk for less than two hours in an eight-hour workday was entitled to little weight.  (R. at 29.)  In reaching this conclusion, ALJ Gonzalez noted that Dr. Dinsmore's opinion was not well-supported by his own treatment notes, which did not demonstrate any significant physical abnormalities.  (R. at 29.)  To support this finding, ALJ Gonzalez cited examples in Dr. Dinsmore's treatment notes.  (R. at 29.)  On December 13, 2010, Dr. Dinsmore's notes indicate that Sesa's back pain was relieved by rest and analgesic medication, and that Sesa did not have any fatigue or dizziness.  (R. at 28, 360-61.)  Dr. Dinsmore also found that Sesa's musculoskeletal system and extremities were normal.  (R. at 28, 360-61.)  On May 2, 2011, Dr. Dinsmore performed a physical examination of Sesa with essentially normal results, for example, a review of her neurological and psychiatric systems

showed no dizziness or emotional disturbances, a physical exam showed that she was in no apparent distress, her respiratory system was normal to inspection, she had normal musculature with no skeletal tenderness or joint deformity, and that her extremities appeared normal, and a neurological review showed that she was alert and oriented.  (R. at 28, 350-51.)  Finally, on May 26, 2010, twenty days after Sesa's alleged disability onset date, Dr. Dinsmore noted that Sesa's pain had not interfered with her activities of daily living and that "functionally, [Sesa] ambulates independently."  (R. at 28, 199.)  A review of Dr. Dinsmore's treatment note indicates that Dr. Dinsmore's assessment of Sesa's limitations was not well-supported.

ALJ Gonzalez also found that Dr. Dinsmore's opinion was entitled to little weight because it sharply contrasted with the objective findings of Sesa's neurologist, Dr. Gorelov.  (R. at 29.)  The ALJ cited two examples to support his conclusion.  On June 1, 2010, Dr. Gorelov's neurological examination was essentially normal with normal motor strength in all muscle groups, normal coordination, and steady gait.  (R. at 197.)  The mental status examination revealed that Sesa was alert and oriented in person, place, and time, and her attention and concentration were normal.  (R. at 197.)  On October 19, 2010, Dr. Gorelov reported electrophysiological evidence of carpal tunnel syndrome and ulnar neuropathies at elbows, but also reported essentially normal physical and mental findings after a general examination of Sesa.  (R. at 293-95.)  Dr. Gorelov's examination does indicate that Sesa suffered from polyneuropathy, but his essentially normal physical and mental findings upon examination of Sesa do not support Dr. Dinsmore's assessment of Sesa's limitations.

The ALJ's conclusions that Dr. Dinsmore's opinion was not well-supported by his own treatment notes and that Dr. Dinsmore's opinion contrasted with Dr. Gorelov's objective findings

is supported by substantial evidence in the record.[8]   Therefore, ALJ Gonzalez's decision to

afford little weight to Dr. Dinsmore's opinion did not violate the treating physician rule.

### 2. Credibility Determination

The Plaintiff argues that ALJ Gonzalez failed to evaluate properly Sesa's credibility and

allegations of pain.   When making a determination of a claimant's residual functional capacity,

the ALJ is required to take the claimant's reports of pain and other limitations into account, but

he may exercise discretion in weighing the credibility of the claimant's testimony in light of the

other evidence in the record.   Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010).   A reviewing

court should accord an ALJ's credibility determination special deference "because the ALJ had

the opportunity to observe the plaintiff's demeanor while [the plaintiff was] testifying."

Marquez v. Colvin, No. 12 Civ. 6819 (PKC), 2013 WL 5568718, at *7 (S.D.N.Y. Oct. 9, 2013).

In this case, ALJ Gonzalez found that "[Sesa's] statements concerning the intensity,

persistence and limiting effects of her symptoms are not entirely credible."  (R. at 29.)

When ruling that a claimant is not entirely credible, the ALJ must provide "specific

reasons for the finding on credibility, supported by the evidence in the case record."  SSR 96–7p,

1996 WL 374186 at *4 (July 2, 1996).  When, as here, the ALJ has found that a claimant suffers

from a medically determinable impairment, "the ALJ must consider the extent to which the

claimant's symptoms can reasonably be accepted as consistent with the objective medical

evidence and other evidence of record."  Genier, 606 F.3d at 49.  The ALJ must consider

statements the claimant makes "about [her] impairments, [her] restrictions, [her] daily activities,

---

[8] Dr. Dinsmore's assessment of Sesa's functional limitations is also inconsistent with the report he prepared for
Sesa's insurance company on July 16, 2010.  (R. at 376-80.)  In that statement, Dr. Dinsmore opined that Sesa had a
moderate limitation of functional capacity and was capable of clerical/administrative sedentary activity.  (R. at 378.)
This is inconsistent with his determination on July 22, 2011, that Sesa could work zero hours per day.  (R. at 374.)

[her] efforts to work, or any other relevant statements [s]he makes to medical sources during the course of examination or treatment, or to the agency during interviews, on applications, in letters, and in testimony in its administrative proceedings." Id.

ALJ Gonzalez properly applied this analysis to Sesa's case. (R. at 29-30.) First, he determined that "despite [Sesa's] subjective complaints, the medical evidence in this case does not support the level of disability alleged." (R. at 29.) Sesa testified to severe side effects from her medication, but treatment notes from April 6, 2011, reported no side effects. (R. at 29, 333.) ALJ Gonzalez compared Sesa's testimony, in which she complained of "constant unrelenting pain" with treatment notes on May 26, 2010, and other dates, where "she informed her doctors that her pain did not interfere with her activities of daily living." (R. at 29, 199.) As to her complaints of back pain, ALJ Gonzalez determined that an MRI scan showed only mild disc bulges, and thus her testimony of back pain was not supported by the MRI findings. (R. at 30, 362.) Sesa testified that her side effects of her medications were severe, but ALJ Gonzalez determined that "not one treating physician noted such severity in their records." (R. at 30.) ALJ Gonzalez found that the medical evidence "sharply contrasts with [Sesa's] testimony." (R. at 29.)

Second, ALJ Gonzalez found that Sesa's complaints of pain were inconsistent with her activities of daily living. In April 2011, Sesa had traveled by car from her home in New York to West Virginia. (R. at 46.) At the hearing, Sesa testified that there were "a number of stops on the way, the trip took [two] days and she did not drive." (R. at 30.) ALJ Gonzalez considered Sesa's testimony and nevertheless found that "such an undertaking is not fully compatible with the activity of a person who is completely disabled." (R. at 30.) ALJ Gonzalez also found that

19

the three-hour drive to the Finger Lakes region of New York that Sesa took in the summer of 2011 was not compatible with the activity of a person who is completely disabled.  (R. at 30.)

Finally, ALJ Gonzalez noted that although Sesa had a very good work history, she applied for and received long-term disability benefits in the middle of 2010.  (R. at 30.)  He determined that "she receives over $5,000 a month and this may have reduced her willingness to engage in other work."  (R. at 30.)  Insofar as the ALJ made any adverse credibility determination based on Sesa's receipt of long-term disability benefits, such a determination was improper.  See, e.g., Cordero v. Astrue, No. 11 Civ. 5020 (PAE), 2013 WL 3879727, at * 26 (S.D.N.Y. July 29, 2013) ("[J]udges within this Circuit have found the use of other sources of income to make an adverse credibility determination improper."); Rinker v. Chater, No. 95 Civ. 3923 (CSH), 1997 WL 47791 at *9 (S.D.N.Y. Feb. 6, 1997) ("The fact that an applicant for disability benefits receives other income which will be lost upon finding employment undoubtedly constitutes a financial disincentive to his returning to work.  This fact, by itself, does not mean that such an individual is less credible when testifying about the pain he or she suffers from a particular impairment.").  However, such an error, standing alone, does not require remand, because the ALJ's credibility determination was independently supported by other substantial evidence, including medical documentation and plaintiff's testimony as to her daily activities and capabilities.  See Cordero, 2013 WL 3879727, at *26.

ALJ Gonzalez met his burden in finding Sesa's claims not entirely credible because the objective medical evidence failed to support her claims of total disability based on pain, and because she remained functional in terms of activities of daily living.

20

### 3.   Function-by-Function Analysis

The Plaintiff argues that ALJ Gonzalez failed to make a function-by-function evaluation of Sesa's impairments.  (Pl.'s Mot. at 21.)  Social Security ruling 96-8p provides that in making a residual functional capacity assessment, an ALJ must "identify the claimant's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis."  SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).  In interpreting Social Security ruling 96-8p, the Third and Sixth Circuits have held that "[a]lthough a function-by-function analysis is desirable, SSR 96-8p does not require ALJs to produce such a detailed statement in writing." Delgado v. Comm'r of Soc. Sec., 30 F. App'x. 542, 547 (6th Cir. 2002) (citing Bencivengo v. Comm'r of Soc. Sec., 251 F.3d 153 (3d Cir. 2000)).  The Second Circuit has not held that a strict function-by-function analysis is required, and numerous courts in this district have found that there is no per se requirement that an ALJ perform a function-by-function analysis of a claimant's abilities in making a residual functional capacity assessment.  See, e.g., Cruz v. Astrue, 941 F. Supp. 2d 483, 498 (S.D.N.Y. 2013) ("[T]here is no per se requirement that an ALJ perform a 'function-by-function' analysis of [a claimant's] abilities."); Daniels v. Astrue, No. 10 Civ. 6510 (RWS), 2012 WL 1415322, at *12 (S.D.N.Y. Apr. 18, 2012) (no function-by-function analysis required); Novak v. Astrue, No. 07 Civ. 8435(SAS), 2008 WL 2882638, at *3 (S.D.N.Y. July 25, 2008) ("The ALJ… need not provide a narrative discussion for each function."); Casino-Ortiz v. Astrue, No. 06 Civ. 0155 (DAB), 2007 WL 2745704, at *13 (S.D.N.Y. Sept. 21, 2007) (finding that the ALJ need not "discuss all of the claimant's abilities on a function-by-function basis").  Instead, it is enough for the ALJ to "explain how the evidence supports his or her conclusions about the claimant's limitations and must discuss the claimant's ability to perform sustained work activities."  Casino-Ortiz, 2007 WL 2745704, at *13.  An ALJ "must avoid

21

perfunctory determinations by considering all of the claimant's functional limitations, describing

how the evidence supports her conclusions, and discussing the claimant's ability to maintain

sustained work activity."  Novak, 2008 WL 2882638, at *3.

Here, ALJ Gonzalez outlined the medical evidence in the record, and stated that upon a

review of the record, he found that Sesa had the residual functional capacity to perform sedentary

work as defined in 20 C.F.R. § 404.1567(a)[9] except that "she must avoid hazards, is limited to

unskilled work, and is restricted to only frequently stooping (due to obesity),[10] and frequently

fingering and handling."  (R. at 27.)

In reaching that decision, the ALJ outlined the evidence in the record that supported his

determination.  ALJ Gonzalez indicated that he gave weight to the reports of Drs. Helprin and

Auerbach.  (R. at 29.)  The ALJ noted that Dr. Helprin examined Sesa and found that she was

able to follow and understand simple directions and instructions and perform simple rote tasks

and complex tasks independently, maintain attention and concentration, maintain a regular

schedule, make appropriate decisions, relate adequately with others, and deal appropriately with

stress.  (R. at 27, 271.)  ALJ Gonzalez also adopted Dr. Auerbach's opinion that Sesa was limited

to lifting ten pounds occasionally, that she could stand or walk for two hours in an eight hour

work day, and sit for six hours in an eight hour work day, with avoidance of heights and hazards,

finding that it was well-supported by the available evidence.  (R. at 29, 258.)  After reviewing

---

[9] "Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 404.1567(a) (2014).

[10] For the purposes of a residual functional capacity assessment, "frequently" is defined as occurring one-third to two-thirds of an eight-hour workday.  SSR 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983).  The Plaintiff argues that ALJ Gonzalez's finding that Sesa was restricted to "only frequently stooping" was either awkward or vague.  (Pl.'s Mot. at 22.)  In light of the definition provided by the Social Security rulings, ALJ Gonzalez's assessment of Sesa's limitations is best read as limiting Sesa to stooping not more than two-thirds of an eight-hour workday.

Sesa's hearing testimony and comparing it to the evidence in the medical records, the ALJ indicated that Sesa was restricted to unskilled work based on her problems with concentration. (R. at 30.)

The Plaintiff argues that ALJ Gonzalez did not adequately support his conclusion that Sesa could frequently stoop "due to obesity." (Pl.'s Mot. at 22.) The Commissioner's rulings recognize that an individual's obesity can affect exertional limitations, including limitations on postural functions such as stooping, and must be considered at step four of the evaluation process. See SSR 02-01p, 2000 WL 628049, at *6 (Sept. 12, 2002) ("Obesity can cause limitation of function….It may…affect ability to do postural functions, such as climbing, balance, stooping, and crouching."). Though ALJ Gonzalez considered Sesa's obesity and its effect on her exertional limitations, he did not provide a narrative explanation as to why he found that Sesa's obesity affected her ability to stoop. However, courts in this district have held that in making an assessment of a claimant's functional abilities, an ALJ is not required to provide "a narrative discussion for each function." Novak, 2008 WL 2882638, at *3. Here, though ALJ Gonzalez did not provide a narrative discussion for precisely how Sesa's obesity affected her stooping, such a description, though desirable, is not required.

A review of the ALJ's residual functional capacity determination shows that he analyzed the entirety of the record, assessed at length the medical opinions presented by various medical professionals, considered Sesa's testimony, and adequately explained how the evidence supported his conclusion as to Sesa's functional limitations. The Court therefore finds that ALJ Gonzalez's finding was supported by substantial evidence, which he identified in the medical record, and was not conclusory. The ALJ performed an adequate analysis of Sesa's residual functional capacity.

23

4. **Evaluation of the Combined Effect of Sesa's Impairments**

ALJ Gonzalez found that although the medical evidence documented that Sesa was status post ovarian cancer and suffered from obesity, sleep apnea, mild bilateral carpal tunnel syndrome, peripheral neuropathy, and lumbar degenerative disc disease, the medical evidence did "not establish that these conditions prevent the performance of work related activities." (R. at 28.) The Plaintiff contends that, in making this determination, ALJ Gonzalez failed to evaluate the combined effects of all of Sesa's impairments. (Pl.'s Mot. at 17-18.) However, the ALJ considered all of Sesa's impairments "singly and in combination" at step three of his analysis, (R. at 27), and his analysis of the medical record and Sesa's testimony, discussed at length above, indicates that he considered the combined effect of her mental and physical limitations. (R. 28-30.) The Plaintiff's argument that the ALJ did not consider the combined effect of all of Sesa's impairments is therefore without support.

ii. **ALJ Gonzalez's Determination that Sesa Did Not Have the Ability to Perform Her Past Work**

The fourth step of the five-step analysis asks whether Sesa had the residual functional capacity to perform her past relevant work. Finding that "the demands of the claimant's past relevant work as a software engineer exceed her residual functional capacity," ALJ Gonzalez concluded that Sesa was "unable to perform past relevant work." (R. at 30.) Because this finding favors Sesa and is not contested by the Commissioner, (see generally Def.'s Opp'n), the Court proceeds to the fifth and final step of the analysis.

24

### iii.  ALJ Gonzalez's Finding that Sesa Could Perform "Sedentary" Work in the Economy

In the fifth step, the burden shifts to the Commissioner, "who must produce evidence to show the existence of alternative substantial gainful work which exists in the national economy and which the claimant could perform, considering not only [her] physical capability, but as well [her] age, [her] education, [her] experience, and [her] training."  Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980) (internal citations omitted).

In meeting the burden under the fifth step, the Commissioner may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, Appendix 2 (hereinafter the "Grid").  Zorilla v. Chater, 915 F. Supp. 662, 667 (S.D.N.Y. 1996).  Taking account of the claimant's residual functional capacity, age, education, and prior work experience, the Grid yields a decision of "disabled" or "not disabled."  Hilliard v. Colvin, No. 13 Civ. 1942 (AJP), 2013 WL 5863546, at *16 (S.D.N.Y. Oct. 31, 2013) (citing 20 C.F.R. § 404.1569, 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(a)).  However, "relying solely on the Grids is inappropriate when nonexertional limitations 'significantly diminish' plaintiff's ability to work so that the Grids do not particularly address plaintiff's limitations."  Vargas v. Astrue, No. 10 Civ. 6306 (PKC), 2011 WL 2946371, at *13 (S.D.N.Y. Nov. 2, 2011) (internal citation omitted).  In such situations, the ALJ is required to consult with a vocational expert.  Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010).

ALJ Gonzalez concluded that Sesa's limitations—(1) avoiding hazards, (2) only frequently stooping, and (3), frequently fingering and handling—had little or no effect on the occupational base of unskilled sedentary work.  (R. at 31.)  This conclusion was proper, as none of these limitations significantly erode the occupational base of sedentary work.  Most sedentary

jobs do not require more than occasional stooping.  SSR 83-14, 1983 WL 31254, at *2 (Jan. 1,

1983).  Few occupations in the unskilled sedentary occupational base require work in

environments with unusual hazards.  SSR 96-9p, 1996 WL 374185, at *9 (July 2, 1996).  Using

the Grid, the ALJ found that a person of Sesa's age, education, work experience, and ability to

perform unskilled sedentary work is not disabled for the purposes of social security benefits.  (R.

at 31.)

Because the ALJ properly found that Sesa's limitations did not significantly narrow the

range of work that Sesa could perform, ALJ Gonzalez was not required to consult with a

vocational expert.  Therefore, the ALJ properly found that Sesa was not disabled within the

framework of the medical-vocational guidelines.  Zabala, 595 F.3d at 411 (no vocational expert

required where nonexertional limitations do not significantly diminish the occupational base).

IV.   **CONCLUSION**

For the reasons discussed above, the Commissioner's determination that Sesa was not

disabled within the meaning of the Social Security Act during the period May 6, 2010, to

September 12, 2011, is supported by substantial evidence.  Accordingly, the Plaintiff's motion

for judgment on the pleadings is DENIED and the Defendant's cross-motion for judgment on the

pleadings is GRANTED.

SO ORDERED.

Dated:  New York, New York
        August 5, 2014

_____/s/_____

Robert P. Patterson, Jr.
United States District Judge

26

**Copies of this Opinion & Order Sent To:**

*Counsel for Plaintiff*

**Irwin Milton Portnoy**
Irwin M. Portnoy and Associates, P.C.
542 Union Avenue
New Windsor, NY 12553
(845)567-0315
Email: IMPortnoy@aol.com

*Counsel for Commissioner of Social Security*

**Tomasina Digrigoli**
Soc. Sec. Admin., Office of The Gen. Counsel
26 Federal Plaza, Room 3904
New York, NY 10278
(212)-264-9184
Email: tomasina.digrigoli@ssa.gov